UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

In re: JAMES B. DOBBS, and
ERIN F. DOBBS

    *Debtors.*　　　　　　　　　　　　　　Case No: 13-03490

RIVERDALE CREDIT UNION

    *Plaintiff,*

v.　　　　　　　　　　　　　　　　　　　Adv. Proc. 14-00007

ERIN F. DOBBS

    *Defendant.*

**ORDER AWARDING JUDGMENT TO PLAINTIFF IN PART**

    Kristen P. Abbott, Attorney for Plaintiff, Montgomery, AL
    Jeffrey C. Robinson, Attorney for Defendant, Selma, AL

This matter is before the Court on the Plaintiff's nondischargeability action under 11 U.S.C. § 523(a)(2)(A) and (4). The Defendant's counsel also made a motion for judgment on partial findings pursuant to Fed. R. Bankr. P. 7052(c) at the close of the Plaintiff's case. The Court has jurisdiction to hear these matters pursuant to 28 U.S.C. § 1334 and 157 and the Order of Reference of the District Court. These are core proceedings and the Court has the authority to enter final orders. For the reasons indicated below, the Court is awarding judgment to the Plaintiff in part and denying judgment in part and denying the motion for judgment on partial findings.

FACTS

1

The Plaintiff, Riverdale Credit Union ("Riverdale") employed the Defendant Erin F. Dobbs ("Dobbs") as a teller in July of 2005. Dobbs worked her way up to Visa Coordinator. As the Visa Coordinator, Dobbs' duties included issuing credit and debt cards, maintaining card accounts, processing member requests for increasing credit limits, and processing member requests for changes in payment due dates. Around March of 2012, Riverdale discovered a cash shortage in Dobbs' cash drawer. On March 9, 2012, Dobbs was suspended from her job and Riverdale commenced an investigation of her activities. On March 30, 2012, Riverdale terminated Dobbs' employment. Dobbs filed for relief under chapter 7 on October 3, 2013 and Riverdale commenced this adversary proceeding to declare certain debts nondischargeable.

A.

CUNA claim

After discovering a $31,000.00 cash shortage in Dobbs' cash drawer in March 2012, Riverdale commenced a full investigation of Dobbs. During the course of the investigation, Dobbs admitted to taking some cash from her cash drawer. After her employment was terminated, she admitted that she may have taken all of the missing money. The investigation also revealed that Dobbs made several personal charges to her Riverdale corporate credit card. During the investigation, Dobbs admitted to making personal charges on the corporate credit card and agreed to repay Riverdale for these charges. In fact, Dobbs did reimburse Riverdale for some of these expenses.

Riverdale carried an insurance policy that included coverage for losses due to employee dishonesty and theft. After the investigation, Riverdale filed a claim for its losses with CUNA Mutual Group ("CUNA"). Its Itemized Statement of Claim included:

1. $31,000.00 due to Dobbs' cash drawer shortage

  2. $1422.58 for personal items Dobbs charged to a Riverdale corporate credit card

  3. $9223.35 for cash advances Dobbs received but did not charge to a credit card; and

  4. $9500.00 in audit investigation expenses incurred during the investigation of Dobbs' cash drawer shortage.

Based on these figures, the total amount claimed was $51,145.93. However, Riverdale claimed a total loss of only $44,685.93 on its Fidelity Proof of Loss. There was no evidence offered to reconcile these two numbers.

  In a letter from Linda Walker, the CEO of Riverdale, to Dobbs, dated November 21, 2012, Walker itemized the payments Riverdale had received from CUNA on account of its claim. She listed:

  1. $30,000.00 Payment from CUNA to cover cash drawer shortage;

  2. $9,500.00 Payment from CUNA to cover audit investigation expense; and

  3. $7,604.60 Payment from CUNA to cover cash advances received but never charged to your VISA account.

  Riverdale received a total of $47,104.60 from CUNA—a figure which is reflected in the Payment Demand letter sent from CUNA to Dobbs dated January 18, 2013. In her November 21, 2012 letter, Walker informed Dobbs that "[t]he figures listed above cover all of our losses with the exception of the $1,000.00 deductible that our insurance policy carries. Once you work out payment arrangements with CUNA and your payments begin, they will reimburse us for the $1,000.00 deductible first before they keep the other funds to cover their paid claim amounts." However, Walker testified that Riverdale had not been reimbursed for the $1,000.00 deductible.

  In June of 2013, Stuart Allan & Associates, Inc. ("Stuart Allan"), acting on behalf of CUNA, offered to settle CUNA's claim against Dobbs for $23,552.30. Dobbs paid Stuart Allan

3

$23,552.30 in June of 2013. Dobbs testified that she believed she had repaid the $1,000.00 deductible as part of the settlement. No documents reflect this.

B.

Credit Card Debts

As Riverdale's Visa Coordinator, Dobbs was responsible for processing credit card applications and processing credit limit increases on credit cards. Further, she had the ability to change payments due dates on credit cards. Walker testified that no employee other than Dobbs had the authority to increase credit limits on cards or "bump" payment due dates. Walker further testified that Riverdale's policy was that employees could not do personal transfers for themselves.

Dobbs testified that other Riverdale employees bumped their payment due dates as well and that she thought she was authorized to issue herself and her husband credit cards. According to Dobbs, other employees were aware of the limits on the Dobbs's personal credit cards. When asked who was aware, she answered that anyone could key in her member number and see what her credit card limits were. When asked why another employee might do this, Dobbs answered that another employee would key in her number if doing a personal transfer for her. When pressed as to why another employee would do a personal transfer for her when she was allowed to do her own personal transfers, she responded that when she first went to work at Riverdale she did her own personal transfers, but at some point she was told that another employee had to do her personal transfers.

On November 29, 2006, Dobbs issued her husband a credit card with a $2,000.00 credit limit. In February of 2007, Dobbs increased the limit on her husband's card to $2,700.00. Walker testified that Dobbs never requested to increase the limit on this credit card above $2,700.00.

4

Riverdale claims the nondischargeable balance on the card at the time the Dobbses filed bankruptcy was $14,537.40. Dobbs' attorney suggested that this figure included interest, late charges, and attorney fees. Counsel for Riverdale contended that this figure represented the principal balance on the card exclusive of any interest and fees. On their bankruptcy schedules, the Dobbses listed the amount due on this credit card as $19,670.00. The discrepancy between what Riverdale claims is nondischargeable and what the Dobbses have said they owe supports Riverdale's position that the $14,537.40 represents the principal balance alone. In light of the Debtors' schedules, Plaintiff's counsel's representations, and Walker's testimony, the Court finds that as of the filing of the bankruptcy the principal balance on B. Dobbs' card was $14,537.40.

On May 3, 2007, Dobbs issued herself a credit card with a credit limit of $4,500.00. Walker testified that Dobbs never submitted paperwork to request an increase above this amount, but the limit was increased. Riverdale claims the nondischargeable balance on the card at the time the Dobbses filed bankruptcy was $9,205.67. Again, Dobbs' counsel suggested that this figure might include interest and other fees, but Plaintiff's counsel represented that it was the principal balance on the card. On their bankruptcy schedules the Dobbses listed the amount due on this credit card as $28,000.00. Again, the discrepancy between what Riverdale claims is nondischargeable and what the Dobbses have said they owe supports Riverdale's position that the $9,205.67 represents the principal balance alone. In light of the Debtors' schedules, Plaintiff's counsel's representations, and Walker's testimony, the Court finds that as of the filing of the bankruptcy the principal balance on Dobbs' card was $9,205.67.

Dobbs issued herself a second credit card without filling out the necessary credit card application. Walker testified that Dobbs never submitted any paperwork requesting increases in

the credit limit on this card. On the date she filed bankruptcy, the principal balance on this credit card was $15,185.91.

Dobbs testified that she had verbal authorization to increase the limits on her credit cards to $10,000.00. She also testified that she was supposed to submit the proper paperwork for a credit limit increase after the fact. She did not submit paperwork for increases beyond the $2,700.00 on her husband's card and $4,500.00 on her card and there is no evidence that she submitted increase requests on the card with no application.

Walker testified that Riverdale's policy was to only approve credit card limits of up to $10,000.00 per member. However, according to Walker, at Dobbs' instruction Visa would increase a credit card limit to more than $10,000.00. Thus, while Dobbs did not have the authority from Riverdale to increase a credit card limit above $10,000.00 per company policy, she had the power as the Visa Coordinator to do so. Dobbs agreed that no other Riverdale member had a credit card limit higher than $10,000.00, but she testified that sometimes credit card balances exceeded $10,000.00 due to interest and fees.

During the course of its investigation, Riverdale discovered that though Dobbs had not been making regular monthly payments on her credit cards, her credit card accounts did not show a delinquency. Dobbs explained that when she was unable to make a credit card payment, she would change the payment due date on the card to keep it from becoming delinquent. Riverdale could not claim the Dobbs' personal credit card charges under its CUNA policy because these charges constituted personal loans which were not covered under the policy. Further, when confronted by Walker about the credit card debts, Dobbs promised that she would repay Riverdale and Walker believed her.

6

Since Dobbs paid CUNA for the insured losses, the only amounts at issue are the $1,000.00 insurance deductible and the losses on the three Visa credit cards totaling $38,928.98.

LAW

I.

§ 523(a)(2)(A)

Riverdale objects to the dischargeability of the debt owed by Dobbs under 11 U.S.C. § 523(a)(2)(A). Under 11 U.S.C. § 523(a)(2)(A), a debtor is not entitled to discharge for any debt for money, property, or services obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. Courts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud. *In re Bilzerian,* 153 F.3d 1278, 1281 (11th Cir. 1998). To prevail on a claim of nondischargeability under this section, the plaintiff must prove by a preponderance of the evidence: (1) the debtor made a representation, (2) that was knowingly false, (3) made with the intent to deceive the plaintiff, (4) the plaintiff actually and justifiably relied on it, and (5) the plaintiff sustained a loss as a proximate result of its reliance. *In re Wood*, 362 B.R. 503, 505 (N.D. Ala. 2007). Objections to discharge of a debt are to be strictly construed against the creditor and liberally in favor of the debtor. *In re Shusteric*, 380 B.R. 58, 63 (Bankr. M.D. Fla. 2007).

A.

CUNA Claim Deductible

Riverdale's CUNA claim arises out of Dobbs' theft of property from her cash drawer, personal charges Dobbs made to her corporate credit card, cash advances Dobbs received but

7

never charged to her credit card, and the investigation of Dobbs' cash drawer shortage. Dobbs admitted to taking the money from her cash drawer and improperly charging personal items to her corporate credit card. When she testified, Dobbs did not deny that she was responsible for the losses that led to Riverdale's CUNA claim and she presented no other evidence to cast doubt on her liability for the losses. Therefore, the Court finds that Dobbs was liable for this debt. Because the liability arises from Dobbs' theft and fraud, it would be nondischargeable.

Dobbs argues that the $23,552.30 settlement she paid to Stuart Allan on or about June 06, 2013 satisfied Riverdale's claim for the $1,000.00 deductible it owed under the policy. To support her contention, Dobbs testified that this was her understanding of the terms of the settlement. Further, in her November 21, 2012 letter to Dobbs, Walker wrote that "[o]nce you work out payment arrangements with CUNA and your payments begin, they will reimburse us for the $1,000.00 deductible first before they keep the other funds to cover their paid claim amounts." Dobbs also pointed out that a letter she received from Stuart Allan on June 4, 2013 stated "Stuart Allan . . . is hereby authorized to accept the sum of $23,552.30 . . . as payment in full for the aforementioned account."

Dobbs did not list the $1,000.00 deductible debt on her schedules, which is consistent with her position that the claim had been satisfied prior to her bankruptcy. Because the Dobbs's chapter 7 was a no asset case, Riverdale was not required to file a claim for the $1,000.00 and it did not file a claim. Walker testified that Riverdale had not been reimbursed for the $1,000.00 deductible, but she did not testify that under Riverdale's contract with CUNA, Dobbs was required to repay the deductible. Further, the Court does not have the policy or any other documentation to support Riverdale's position that Dobbs, rather than CUNA, is contractually responsible for repaying the $1,000.00. In fact, the letter from Riverdale to Dobbs dated

8

Case 14-00007    Doc 36    Filed 02/02/15    Entered 02/03/15 09:00:24    Desc Main
Document      Page 8 of 15

November 21, 2012 states that she is to pay CUNA which will then reimburse Riverdale. Dobbs did pay CUNA. Without more evidence from Riverdale on this point, and in light of Dobbs' testimony and the letters from Walker and Stuart Allan, the Court finds that Riverdale has not met its burden of establishing its claim. Therefore, the nondischargeability claim is denied as to the $1,000.00 deductible.

B.

Credit Card Debt

Riverdale argues that Dobbs' debt to it is nondischargeable because Dobbs issued herself and her husband credit cards against company policy, increased the limits on her and her husband's credit cards against company policy, and "bumped" the due dates on her credit cards against company policy.

With respect to the first and second elements of the claim, (1) that the debtor made a representation, (2) that was knowingly false when the representation was made, it is not clear which representation Riverdale relies on to establish its claim. Dobbs had the power, if not the authority, to issue the credit cards she issued, increase the credit limits on those cards, and "bump" the due dates on those cards. She did not have to make a specific representation to Riverdale to take these actions. There is no evidence in the record that Dobbs made any specific representation to Walker or any other employee at Riverdale in order to take out the credit cards, raise the credit limits, or "bump" the payment due dates. Further, Riverdale did not argue that any information Dobbs' listed on her credit card applications was a misrepresentation. Riverdale might argue that Dobbs falsely represented *to Visa* that she had authority to take these actions, but Visa is not the complainant here. Therefore, Visa's reliance on Dobbs' false representation cannot satisfy the fourth element of the claim. For these reasons, the Court finds that Riverdale

has not met its burden of establishing the credit card debt at issue is nondischargeable under the fraud exception to discharge found in § 523(a)(2)(A).

## II.

## § 523(a)(4)

Riverdale objects to the dischargeability of the debt owed by Dobbs under 11 U.S.C. § 523(a)(4). Under § 523(a)(4), debts incurred "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are nondischargeable. To succeed on a § 523(a)(4) claim, the Plaintiff must prove the elements of the claim by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279 (1991). Objections to discharge of a debt are to be strictly construed against the creditor and liberally in favor of the debtor. *In re Shusteric*, 380 B.R. 58, 63 (Bankr. M.D. Fla. 2007).

### A.

### CUNA Claim Deductible

As explained above, Dobbs presented evidence that she had satisfied Riverdale's claim for the $1,000.00 deductible prior to her bankruptcy. Therefore, any claim based on this liability is dischargeable.

### B.

### Credit Card Debt

#### 1.

#### Larceny

As set out above, the Plaintiff has failed to show by a preponderance of the evidence that Dobbs incurred the credit card debt through fraud. Additionally, the plaintiff did not present evidence to support a claim of larceny. Larceny is "[t]he unlawful taking and carrying away of someone else's personal property with the intent to deprive the possessor of it permanently." Black's Law Dictionary, (7th ed. 1999). Riverdale has not alleged that Dobbs did not intend to repay the credit card debt at the time it was incurred or that incurring the debt was an "unlawful" act in and of itself. No evidence was presented to support such a case either. Therefore, for this debt to fit within the § 523(a)(4) exception to discharge, it must have been incurred for "defalcation while acting in a fiduciary capacity" or for embezzlement.

2.

Defalcation while acting in a fiduciary capacity

11 U.S.C. § 523(e) states that "[a]ny institution-affiliated party of an insured depository institution shall be considered to be acting in a fiduciary capacity with respect to the purposes of subsection (a)(4)." As the Visa Coordinator and an employee of Riverdale, Dobbs was an "institution-affiliated party" for purposes of this section. Therefore, she owed fiduciary duties to Riverdale when acting within her capacity as Visa Coordinator.

"Defalcation" within § 523(a)(4) is "a failure to produce funds entrusted to a fiduciary." 4 COLLIER ON BANKRUPTCY ¶ 523.10[1][b] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.). The term requires an "intentional wrong." *Bullock v. BankChampaign, N.A.,* 133 S.Ct. 1754, *1759 (2013). The requisite "intentional wrong" includes "conduct that the fiduciary knows is improper but also reckless conduct." *Id.*

The testimony from Walker and Dobbs did not clearly establish what Riverdale's official policy was with respect to the Visa Coordinator's authorization to approve her own credit limits and "bump" due dates. Walker testified generally that employees could not complete personal transactions themselves. Dobbs testified that at first she had permission to complete personal transactions herself but that the permission was revoked at some unspecified point. Further, Dobbs testified that other employees "bumped" their due dates to avoid a delinquency. Because the evidence does not clearly establish what Riverdale's policies and practices were regarding personal transactions by employees, Riverdale has not carried its burden of establishing that Dobbs violated her duties by issuing herself and her husband cards, increasing the credit limits, and "bumping" due dates. Further, there is no evidence in the record indicating when Dobbs took these actions or what her financial position was at the time that she took the actions. Therefore, the Court cannot infer that Dobbs "consciously disregarded a substantial and unjustifiable risk" that she would be unable to repay the credit card debt at the time that she increased limits and made charges.

However, Walker testified that Riverdale's policy was that no member could have a credit limit over $10,000.00. Dobbs agreed with this testimony. Therefore, the Court finds that in increasing her and her husband's credit card limits above $10,000.00, Dobbs did knowingly and intentionally breach her fiduciary duties to Riverdale. While the Court does not find specific fraudulent intent, in exceeding Riverdale's company-wide credit limits, Dobbs did "consciously disregard a substantial and unjustifiable risk" that she would default on her obligations to Riverdale. She knew she had taken out three cards and had caused a substantial loss to Riverdale that it would seek to recover when discovered. The amount of the debtors' respective credit card debt that exceeds $10,000.00 is, therefore, nondischargeable.

12

Case 14-00007    Doc 36    Filed 02/02/15    Entered 02/03/15 09:00:24    Desc Main
Document    Page 12 of 15

## 3.

## Embezzlement

"Embezzlement" under § 523(a)(4) is defined by federal common law. *Fernandez v. Havana Gardens,* 562 Fed. Appx. 854 (11th Cir. 2014). Federal common law defines embezzlement as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Id.* at 856. To establish an embezzlement claim, Riverdale must show "(1) that the debtor appropriated the subject funds for her own benefit and (2) that she did so with fraudulent intent or deceit." *In re Ingle,* 2011 WL 6179148, *2 (Bankr. S.D. Ind. 2011).

The Plaintiff has failed to establish that Dobbs incurred the credit card debt with fraudulent intent. As evidence of fraudulent intent, Riverdale established that Dobbs increased the limits on her and her husband's credit cards, "bumped" payment due dates so that her accounts would not be delinquent, and authorized a credit limit above $10,000.00 on her personal credit cards. Walker testified that all of these actions were against company policy. Dobbs, however, testified that she thought she was authorized to increase the limits on her cards. Dobbs further testified that when she started working at the bank she was allowed to complete personal transactions, but that at some point she was told that she could not complete personal transactions herself. Riverdale's policy manual or some similar evidence was not submitted to the Court. The only evidence the Court has about Riverdale's policies, procedures, and actual practices is the testimony of Walker and Dobbs. While there is disagreement in the testimony about what Dobbs was authorized to do with her own credit cards, the Court found both witnesses to be credible. Riverdale's policy may be that employees should not complete personal

13

transactions (like approving their own credit limit increases) themselves, but the policy may not have always been followed by employees and Dobbs may not have understood the policy as it applied to her own credit card transactions. Finding both witnesses credible, the Court finds that Riverdale has not met its burden of proving by a preponderance of the evidence that Dobbs increased her credit limits, bumped her payment due dates, or exceeded the $10,000.00 limit with "fraudulent intent." Riverdale presented no evidence of when credit limit increases were made on Dobbs' credit cards, when she bumped payment due dates, or when she increased her card limits above $10,000.00. Therefore, the Court has no evidence of Dobbs' financial position at the time that she took these actions. The credit cards were taken out in 2006 and 2007, years before her theft was discovered in 2012. Dobbs testified that she always intended to pay off her credit cards and that she did, in fact, make payments on the credit cards even after she lost her job. Finding no fraudulent intent, the credit card debt cannot be nondischargeable on account of embezzlement.

### III. Motion to Enter Judgment on Partial Findings

At the close of the Plaintiff's case, the Defendant moved for judgment on partial findings. In accordance with Rule 7052(c), the Court declined to render a judgment prior to the close of all evidence. Rule 7052(c) of the Fed. R. Bankr. P. provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." In making a judgment on partial findings, "the Court may resolve conflicts in the evidence as well as make credibility assessments. Additionally, the Court should evaluate the evidence without making any special inferences in favor of the non-moving party and should resolve the case on the basis

of a preponderance of the evidence." *In re Smith,* 296 B.R. 46 (Bankr. M.D. Ala. 2003) (quoting *Wells v. Brown & Root, Inc.,* 65 F.Supp.2d 1264, 1268 (S.D. Ala. 1999) (other internal citations omitted).

The Court is denying the Defendant's motion for judgment on partial findings. Through Walker's testimony, Riverdale presented evidence to support its § 523(a)(2)(A) and (4) claims. Dobbs' testimony regarding her intent in taking out the credit cards, her understanding of the CUNA settlement agreement, and her understanding of her authority as Visa Coordinator were necessary to refute Riverdale's claims.

## CONCLUSION

For the reasons set forth above, the Court finds that $4,537.40 on B. Dobbs' credit card is nondischargeable. The Court also finds that $14,391.58 on E. Dobbs' credit cards is nondischargeable. These figures represent the amount by which B. Dobbs and E. Dobbs respectively exceeded Riverdale's company-wide $10,000.00 credit limit. Further, the Court finds that Riverdale has failed to establish that Dobbs owes the $1,000.00 CUNA deductible. Any claim based on this debt is dischargeable. Therefore, IT IS ORDERED that Plaintiff's motion to determine dischargeability is GRANTED IN PART and DENIED IN PART and Defendant's motion to enter judgment on partial findings is DENIED.

Dated: February 2, 2015

*Margaret A. Mahoney*
MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE